**Paul V. HUTTON, Plaintiff,**

v.

**Arthur S. FLEMMING, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. W–2006.**

United States District Court
D. Kansas.

June 18, 1960.

Hegler, Meador, Koerner & Bush, by Otto J. Koerner, Wichita, Kan., for plaintiff.

Wilbur G. Leonard, U. S. Atty., Topeka, Kan., and George E. Peabody, Asst. U. S. Atty., Wichita, Kan., for defendant.

HILL, Chief Judge.

Plaintiff has made timely application to this Court, seeking the review of a final decision of the Secretary of Health, Education and Welfare (Title 42 U.S.C.A. § 405(g), which determined that plaintiff did not qualify for the so-called "disability freeze" provision of the Social Security Act (42 U.S.C.A. §§ 416(i)(1)(A) and 415(e)(4)(A).

In this action this Court is limited to a consideration of the record (42 U.S.C.A. § 405(g)) and must treat any factual findings as conclusive where supported by substantial evidence. Both parties have moved for summary judgment; supporting their motions by oral argument and memoranda.

From the record it appears the plaintiff is 51 years old, married, and has one child under the age of 18 years. He received a grammar school education and completed three years of high school. His rather varied work history reveals restaurant work; roofing salesman; crew leader or supervisor building airplanes at Beech Aircraft Company during the war. He was self-employed at one period, operating a luncheonette. He has experience as a motor car salesman. He has been service manager and done supervisory work and management work.

In his application to establish a period of disability, plaintiff stated he first became unable to work in July, 1955, because of "Heart Trouble and Back Injury". At the time he ceased working he was employed as a service manager at Swenson's Motor Company, Wichita, Kansas.

The evidence indicates plaintiff fell from a ladder in May of 1955 hurting his back. Upon his return to work he suffered a heart attack following which he was hospitalized. He was hospitalized again in September, 1955, for two or three weeks. In 1956 he progressed to the point of selling by telephone from his home. He was employed by Osborne Continental Restaurant from January, 1957, to May, 1957. In July, 1957, he was employed by a motor car dealer as a salesman, approximately half-time.

During July, 1957, while moving cars, he suffered chest pain, his physician had him hospitalized and he has not worked since.

The medical evidence consists of reports from Doctors Ernest P. Carreau, M.D.; Wirt A. Warren, M.D., dated May 16, 1956, March 13, 1958, September 8, 1958; Paul Binter, M.D.; Edward Tihen, M.D.; Don Miller, M.D.

The term "disability" when it is used in a proceeding to establish a wage freeze, such as here, has been defined by

Congress in the applicable statutory law as, "\* \* \* inability to engage in *any substantial gainful activity* by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." Title 42 U.S.C.A. § 416(i)(1)(A). This rule was applied and unless the Secretary's ruling fails to meet the test of substantial evidence to support it, it must stand. With this latter rule in mind the Court has carefully considered the record which is now before the Court.

The record discloses in connection with the fall suffered by this plaintiff in 1955, Dr. Carreau in his medical report indicates objective findings as follows:

"Mild degenerative changes dorsal sacral spine, narrowing of lumbar sacral inter space. Minimal hypertrophic spurring dorsal area calcification between D–10 and D–11."

Treatment:

"Relief of pain and muscle spasm, hard bed, bed rest, diathermy to low back, postural advice."

The Doctor has not seen the plaintiff since August 7, 1955.

With regard to the "Heart condition" the medical report of Dr. Warren of May 16, 1956, discloses:

"Dizzy spells." "Choking spells in neck, 'also' 'pain with it.' Pain in rt. anterior chest radiating toward rt. arm. Feeling as if there were a 'staub' in lt. side of chest. 'Discomfort' in arterior chest on exertion." "Pain in rt. leg below knee."

(b) "December 16, 1955." "Abnormal E.K.G."—old myocardial infarction. (Anterolateral wall)."

Diagnosis stated as follows:

"1.) Arteriosclerotic Heart Disease with *old* myocardial infarction and anginal syndrome.

2.) Painful shoulder syndrome rt.

3.) Marked functional 'overlay'."

Dr. Warren prescribed treatment of adequate rest, nitroglycerin, and phenobarbital. Doctor Warren indicated the condition was static and that it was unlikely the angina will decrease but the plaintiff should be much better as far as neurotic symptoms are concerned when compensation claim is settled. Further, under remarks, the Doctor stated:

"Condition and complaints vary with seeming nearness of settlement of compensation claims. Has been advised that he could perform light work—hasn't succeeded in securing same—also hasn't looked very hard. Suggest referral to Voc. Rehab. Service and expediting of settlement of compensation claim."

Doctor Warren furnished a letter to the Bureau dated March 13, 1958, reading as follows:

"The following is excerpted from a letter to this patient's attorney on November 3, 1955.

" 'Mr. Hutton suffered a myocardial infarction about Aug. 6, 1955. The condition was of moderate severity and he has been making quite satisfactory progress except for the fact that he required rehospitalization from Sept. 16th to 24th because of angina pectoris due to the impairment of the blood supply to the heart muscle. Since being released from the hospital the second time his progress has been quite satisfactory.

" 'Since Aug. 6, 1955 his disability evaluation has been, of course, 100%. The degree of permanent disability which he may have received cannot be evaluated at the present time.' "

"Mr. Hutton attempted to return to work in June, 1957, but was forced to stop working because of the severity of his angina. In my opinion he is still totally disabled due to ischemic heart disease. (See previous reports supplied your Bureau in 1956.)"

The medical report of Dr. Paul A. Binter, M.D. of Wichita, indicated as follows:

" * * * Pain radiating into throat and arms with exertion." E.K.G., etc. (Chest film) are presently normal."

The Doctor prescribed routine treatment with nitroglycerin and the condition was said to be static. Under remarks it was stated:

"Severe angina pectoris—abnormal lab findings but this is not unusual."

Dr. Edward N. Tihen, of the Wichita Clinic, conducted an examination of the plaintiff and his report of May 13, is as follows:

"The patient is a slender 50 year old man who is not in apparent distress. His height is five feet eight inches and weight is 139 pounds. The temperature is normal. The pulse is 84 and regular in rhythm. The blood pressure is 154/90. The pupils are equal and react normally to light and accommodation. The head and neck are otherwise not remarkable. The pharynx is normal. The thyroid gland is not enlarged. The lungs are clear to percussion and auscultation. Examination of the heart shows a normal sinus rhythm with no murmurs or gross enlargement. Examination of the abdomen shows no distension, rigidity, abnormal tenderness or palpable masses. The genitalia are normal and no hernia is present. Rectal examination and the prostate gland are normal. Examination of the extremities shows no ankle edema. The deep reflexes are normal and equal on the two sides and no Babinski sign is present. The dorsalis pedis and posterior tibial arterial pulses are good, with the exception of the left posterior tibia which I was unable to feel.

Laboratory and X-ray tests were as follows:

Electrocardiogram Normal sinus rhythm at a rate of 72 per minute. P–R interval o.16 second. QRS interval o.08 second. The P waves are normal. The QRS complexes are within normal limits except in lead V2 where no R wave is present and there is a deep QS, and in lead V3 where there appears to be a two millimeter Q wave. There is minimal depression of the ST segments in leads V4, V5 and V6. T waves are upright except for slight inversion in lead AVL. The T waves in leads V3 and V4 are low and upright.

Interpretation: The abnormalities of QRS complexes and low T waves in leads V2, V3, and V4 are compatible with an old anterior myocardial infarction. From a previous electrocardiogram in our possession taken in December, 1955, it is known that this patient has in fact sustained an anterior myocardial infarction prior to that time. There is no evidence of any recent activity of this process and to a considerable extent the electrocardiogram has reverted toward a normal pattern from the one following his old attack.

Chest X-ray: No evidence of pathology is seen in either lung. The diaphragms, heart, and mediastinal instructures appear normal except for a very small amount of arteriosclerotic calcification in the aortic arch. No skeletal pathology is seen. Conclusion: No evidence of active chest pathology. There is evidence of a small amount of arteriosclerotic calcification in the aorta.

Opinion: As a result of my examination of Mr. Hutton, my diagnoses in his case are as follows:

"1) History of an acute anterior myocardial infarction in July, 1955, which was confirmed electrocardiographically.

"2) Coronary sclerosis with angina pectoris of mild to moderate severity.

242

"3) Rather marked anxiety state and apprehension which is responsible for a fair part of the patient's complaints of disability.

"4) Lancinating neuromuscular pains in the upper arms which are probably unrelated to the heart.

"5) Minimal hypertension."

On September 8, Doctor Warren furnished yet another report. Under remarks he stated:

"This patient had an unquestionable myocardial infarction followed later by moderate angina pectoris which has slowly diminished. Long-term anti-coagulant therapy was attempted but unsuccessfully because of production of hematuria. Coronary thrombosic, (judged by the courts to be *due to circumstances of patient's employment,)* has resulted in prolonged period of recovery and perhaps production of permanent neurotic disability."

Dr. Miller's report of January 26, 1959, confirmed the diagnosis of an old infarction and he had prescribed bed rest and medication with poor response.

■ The Referee found from this evidence that while the plaintiff had sustained his burden of qualifying under the first test, in that his impairment was of long lasting duration, the impairment was not sufficiently severe to prevent him from engaging in substantial gainful employment.

■ It is obvious from the record that this finding is supported by substantial evidence. The proper test of "substantial gainful employment" is the possibility of finding employment in *any* field and is not restricted to the type of work or the earning capacity of the wage earner prior to disablement. Fuller v. Folsom, D.C., 155 F.Supp. 348.

There is ample evidence to indicate that this man could engage in light or sedentary work. He is qualified for such work by his past education, work experience, and there appears no reason why this plaintiff could not adapt himself to light or sedentary work, if he elected to do so.

It Is, Therefore, the Order of the Court that the motion for summary judgment of the plaintiff be, and the same is, hereby overruled, and that the motion of the defendant be, and the same is, hereby sustained.